KENTUCKY CENTRAL LIFE
INSURANCE COMPANY,
Appellant,

v.

Don W. STEPHENS, Commissioner
of the Kentucky Department of
Insurance, Appellee.

KENTUCKY CENTRAL LIFE
INSURANCE COMPANY,
Appellant,

v.

Don W. STEPHENS, Commissioner
of the Kentucky Department of
Insurance, Appellee.

Nos. 94–SC–743–TG, 94–SC–742–TG.

Supreme Court of Kentucky.

May 11, 1995.

Charles S. Cassis, Brown, Todd & Heyburn, Louisville, Paul E. Sullivan, Thomas C. Walker, Susan Mohler, Kathryn Kendrick, Brown, Todd & Heyburn, Lexington, for Kentucky Cent. Life Ins. Co.

Steven L. Beshear, Janet A. Craig, Stites & Harbison, Lexington, Robert Michael Connolly, Louisville, Judith A. Villines, Stites & Harbison, Frankfort, for Don Stephens, Com'r of the Kentucky Dept. of Ins.

James H. Newberry, Jr., Susan C. Sears, Newberry, Hargrove & Rambicure, Lexington, Kevin Griffith, Charles T. Richardson, Baker & Daniels, Indianapolis, IN, for National Organization of Life and Health Ins. Guar. Associations, Illinois Life & Health Ins. Guar. Ass'n, and Texas Life, Accident, Health & Hosp. Service Ins. Guar. Ass'n.

Caroline Scott, Texas Dept. of Ins., Austin, TX, Bradley R. Hume, Woodward, Hobson & Fulton, Louisville, Dan Morales, Atty. Gen. of Texas, Jorge Vega, Diane Barlow Sparkman, Office of the Atty. Gen., Austin, TX, for Rebecca Lightsey, Com'r Texas Dept. of Ins.

Charles S. Cassis, Brown, Todd & Heyburn, Louisville, for Kentucky Cent. Life Ins. Co.

REYNOLDS, Justice.

In this insurance liquidation proceeding, the Franklin Circuit Court approved the sale of Kentucky Central Life Insurance Company's (KCL) assets, including the company's insurance business, and ordered KCL's liquidation. The current board of directors of KCL seeks reversal and remand upon the basis that the decision failed to comply with the Kentucky insurer's rehabilitation and liquidation laws and was made in contravention of the constitutional rights of KCL and its shareholders.[1]

KCL was incorporated in Kentucky in 1902 and commenced operating as a domicile life insurance company selling various types of life insurance and annuity products. By 1990, KCL had approximately $55.3 billion of life insurance in force. By 1992, it was authorized to sell insurance in 49 states and the District of Columbia. It had expanded into the universal life insurance business, and also had moved into what is described as an aggressive mortgage loan and real estate investment program. Its assets approximated $2.1 billion on a consolidated basis. This included its subsidiary operations engaged in the businesses of property and casualty insurance underwriting and television and radio broadcasting. There were some 450,000 individual policyholders and pension plan participants and approximately 1,000 employees.

In the late 1980's controversy arose between the heirs of Garvice Kincaid, a substantial KCL stockholder, and the then-KCL board of directors. In 1990, the Department of Insurance scheduled quadrennial examinations of KCL for several past years. Concerned with substantial and risky investments in mortgage loans and real estate, the Department obligated KCL to put in place a $40 million reserve for loan and real estate losses. The National Association of Insurance Commissioners (NAIC) established a working group to monitor KCL's mortgage loan and real estate portfolio, investments which represented 40 percent of the company's entire portfolio. A declining real estate market and the informal procedures utilized made valuation of KCL's assets uncertain. Insurance industry rating groups lowered KCL's ratings and as policyholders became aware of the condition, policies were submitted for their cash values. By February 1993, the average daily surrender amount was nearly $1 million. In both 1992 and 1993, the Kentucky Insurance Commissioner was meeting with KCL and reporting periodically to NAIC. KCL was directed to undertake an effort to attract investors for an infusion of additional cash. Interested investors declined after completing due diligence on KCL. On February 11, 1993, the state of California issued a cease and desist order against KCL. Texas followed on February 12, 1993, and on this same day, the Kentucky Insurance Commissioner (Commissioner) announced his intentions to take control of the company. In quick succession, at least 43 additional states and the District of Columbia suspended KCL's privileges. The president and board members concurred and thereafter resigned their positions. In time, the

---

1. This Opinion relates to the second of three cases argued orally before the Supreme Court at its March 1995 term.

Kincaid heirs (voting stockholders) were elected to positions of directorship of the company.

Subsequent to Franklin Circuit Court's placing KCL in rehabilitation, the Commissioner obtained a court order imposing a moratorium on the surrendering of policies which was deemed necessary to stop the "run." The Commissioner employed qualified experts to assist him with rehabilitation of the company. Ernst & Young was primarily engaged to evaluate the real estate and mortgage loan portfolio and the company's accounting procedures. Charles Carroll (an Ernst & Young partner) acted as the Commissioner's primary advisor and was recognized as a specialist in insurance company acquisition, rehabilitation, and mergers. Both Bankers Trust and Creamer Realty were engaged to evaluate and manage KCL's mortgage loans and real estate assets.

The issues raised by KCL—deprivation of both KCL's and its shareholders' constitutional rights and a failure by the Commissioner to comply with the insurers' rehabilitation and liquidation law—are answered in part by a substantive recitation of the facts in the record.

The Commissioner's primary concern was the design of a plan which would secure policyholder values. His experts proposed four options to further the primary goals, inclusive of rehabilitation. The options considered were: (1) an infusion of capital from outside investors; (2) an assumption reinsurance agreement which would provide that a viable insurer would receive some company assets in return for the assumption of primary liability for the policies; (3) immediate liquidation; and (4) indemnity reinsurance with another insurer whereby KCL would remain a primary obligor and a reinsurer would become secondarily liable in return for transfer of KCL assets. The experts did not, however, recommend either the third or fourth option plans.

A detailed offer and bidding process which concerned only options one and two was developed. Throughout all processes, no capital-infusion-type bid was received. Chronologically the record reflects that it was ascertained during this period that the true valuation of KCL's real estate and mortgage loan assets disclosed a $141 million deficit, which subsequently resulted in disposal of part of the assets by group sales. KCL was perceived to be deeply insolvent.

A self-rehabilitation committee of KCL employees was established and the Commissioner, although not statutorily obligated, permitted the committee to operate and to undertake independent efforts to establish some means of rehabilitation. A member of the current KCL board of directors participated on the committee and the Commissioner provided actuarial assistance. The committee actively, but unsuccessfully, contacted potential investors. KCL has asserted that the committee's efforts were unsuccessful because the Commissioner denied its request for audited financial statements, but the record discloses otherwise.

In February 1994, the Commissioner sought approval of a reorganization and reinsurance plan and a petition for liquidation. Notice of hearings was sent to all shareholders, creditors, and policyholders. The shareholders, interested in the rehabilitation, utilized a representative, The Firemark Group, which was among the groups that signed confidentiality agreements and reviewed the data room documents prior to any of the bidding processes. Subsequently, after the filing of the petition for liquidation, the board exercised its statutory right to defend against the liquidation. The trial court granted the board's request to take formal discovery, but directed that it be done on an expedited basis. Although the board previously had access to the data room since May 1993, (via its representative, The Firemark Group) it was again afforded access to the thousands of documents contained therein. The board's request for further documents was granted. The board's counsel had access to all the witnesses that it sought to interview. The court limited questioning to four hours per witness, but in fact unrestricted questioning was permitted. The testimony in question was both recorded and transcribed and such transcripts were used by the board at the subsequent hearing. The hearing before the trial court proceeded despite the board's attempt to extend/delay the

proceeding. The board's counsel was permitted to cross-examine, at length, all witnesses produced by the Commissioner. The board subpoenaed witnesses and called all witnesses it desired. The record discloses that the court permitted the board to employ an accounting firm for its use and to hire other experts at KCL's expense. The court allowed KCL to present, in detail, its alternative plan contending to be a self-rehabilitation program.

It is asserted that no genuine effort was made to rehabilitate KCL. Such an argument lacks strength in view of the Commissioner's efforts to procure infusions of cash, along with the consideration of alternative plans of self-rehabilitation offered by KCL's employees. Consider further that when the open bid process plans were devised, the primary step sought an infusion of capital without success. An adequate record exists upon which to base the trial court's finding that further attempts to rehabilitate KCL would substantially increase the risk of loss to policyholders and creditors and would be futile.

■ The purpose of Subtitle 33 of Chapter 304 of the Kentucky Revised Statutes (KRS 304.33–010) is the protection of the interest of the insured, creditors, and the public generally, with minimum interference with the normal prerogative of the proprietors. The subtitle, which embodies the liquidation provisions, has been enacted in similar form by most states for the purpose of handling financially troubled insurance companies. Further, it provides a basic framework to be followed by insurance commissioners and the courts when intervention in management becomes necessary. The subtitle provides Franklin Circuit Court broad discretion as to supervision of the proceedings. KRS 304.33–040 pertains to the exclusiveness of proceedings and states that the court shall have exclusive jurisdiction over all matters relating to the proceeding, including all disputes over assets. The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of the subtitle. Section (3)(c) states that no provisions in the subtitle shall be construed to preclude the court from, on

its own motion, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules or to prevent an abuse of process.

■ KRS 304.33–160(2) extends to the Commissioner broad discretion in his efforts to rehabilitate the company and provides that as rehabilitator the Commissioner may take such action as deemed necessary or appropriate to reform or revitalize the insurer. Full powers are granted to deal with the property and business of the insurer. The right to propose a plan of reorganization and reinsurance, if determined to be necessary, is granted to the Commissioner. KRS 304.33–160(5). Certainly, the Commissioner is a creature of statute and has no authority except that which the statute confers upon him. *See Allin v. American Indemnity Co.*, 246 Ky. 396, 55 S.W.2d 44 (1932). We distinguish KCL's citation of *U.S. Mining and Exploration Natural Resources Co., Inc. v. City of Beattyville*, Ky., 548 S.W.2d 833 (1977), as it bears no relationship to the case now before the Court.

■ The business of insurance is affected with a public interest and the state has an important and vital interest either in the liquidation or reorganization of such a business. Neither the insurance company nor policyholders have inviolate rights that characterize ordinary private contracts. The policyholders' contracts as well as others with interest in the company, are subject to a reasonable exercise of state police power. We agree with KCL's statement that rehabilitation is preferable to liquidation, but this ideal cannot survive the trial court's measured finding that "[f]urther attempts to rehabilitate Kentucky Central Life would substantially increase the risk of loss to policyholders and creditors and would be futile."

■ KCL states that prior to the commencement of liquidation, there is a requirement of proof that rehabilitative efforts would substantially increase the risk of loss or be futile. Proof, as in this case, may take on several forms and a rehabilitator is granted authority to make judgments and take actions he believes to be in the public interest. The trial court's primary role is a su-

pervisory one and the standard of the court's review of the rehabilitator's actions is one of abuse of discretion. Under the special statutory proceedings, the Commissioner is granted administrative discretion in the context of the insolvency/delinquency proceedings and the burden of proof is upon those contesting the Commissioner's actions. *Foster v. Mutual Fire, Marine and Inland Ins. Co.*, 531 Pa. 598, 614 A.2d 1086 (1992).

■ In determining whether rehabilitation should give way to liquidation, it is, of course, important to consider the conditions and causes which led to the making of the order of rehabilitation. On the date that the Commissioner of Insurance met with the board of KCL and advised of his intentions to file these proceedings against the company, the board's decision was to agree and accept the Commissioner's actions. The statements made in the petition may be accepted as facts subsequently proved to the satisfaction of the trial court by virtue of its findings of fact. KCL, concededly, found itself unable to meet the fulfillment of its obligations. We have heretofore referred to these steps, among others, which were taken by the rehabilitator in an endeavor to improve KCL's condition, and without a rush to liquidation, the Commissioner, believing that further efforts to rehabilitate the company would be futile, instituted the liquidation proceeding. Certainly, the business formerly done by the company was no longer available to it, and before the moratorium, the surrender of policies cascaded to $1 million per day. The distinct outlook for any improvement was becoming increasingly worse as time passed on. Something more than hope is necessary to justify the continuation of rehabilitation at the expense of the policyholders and general creditors. Circumstances obviously justified the conclusion of the Commissioner that further efforts to rehabilitate would serve no useful purpose, and the lower court's finding that KCL continued to be insolvent is amply supported by the evidence of record.

With the judgment of the Commissioner of Insurance being that liquidation was subsequently desirable and necessary, we determine that only a strong showing to the contrary would have justified the trial court's refusal to follow the recommendations of the administrative officers to whom the supervision of the insurance company was entrusted by the legislature. *In re New York Title & Mortgage Co.*, 156 Misc. 186, 281 N.Y.S. 715 (1935).

■ KCL advances an argument that Franklin Circuit Court failed to conduct the proceedings on the petition for liquidation in accordance with Kentucky Rules of Civil Procedure. We have determined that insurance rehabilitation/liquidation proceedings are *special statutory proceedings.* Rule 1(2) of the Rules of Civil Procedure provides: "These Rules govern procedure and practice in all actions of a civil nature in the Court of Justice except for *special statutory proceedings, in which the procedural requirements of the statute shall prevail over any inconsistent procedures set forth in the Rules.*" (Emphasis added.) The application and utilization of special statutory procedures, in lieu of any inconsistent civil rule, may be left largely to the supervision of the trial judge in the exercise of sound judicial discretion.

We believe that KCL indeed has a heavy burden in its presentation of proof and reasoning that liquidation was not in the best interest of the policyholders and creditors or that the proceedings leading to the conclusion were procedurally deficient. *See In re New York Title & Mortgage Co., supra.* Clearly, the principles cited in *West v. Goldstein,* Ky., 830 S.W.2d 379 (1992), have no application in this case insofar as *West* was a will contest proceeding with no semblance to this case which embodies special statutory proceedings.

■ KRS 304.33–040 places exclusive jurisdiction in Franklin Circuit Court and provides that the court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this subtitle. It is the court, not the legislature, that takes any nonarbitrary action or makes any nonarbitrary determination which is necessary to implement court orders or rules. *See Ex parte Auditor of Public Accounts,* Ky., 609 S.W.2d 682 (1980). The trial court was within its authority to permit discovery to be conducted in an expedited man-

ner. The term expeditious is to be equated to promptness and carefulness. The statutes have not been proposed to trample rights, but merely to supply a reasonable (nonarbitrary) method to facilitate, for public purposes, a fair solution to a matter of insolvency. The statutes afford the trial court authority to limit any protracted course of action. *See Milner v. Gibson,* 249 Ky. 594, 61 S.W.2d 273 (1933).

KCL's arguments/statements with regard to discovery are not without bias. KRS 304.33–180(1) specifically provides directors with the statutory authority to defend against the Commissioner's petition for liquidation. We find the trial court's ex parte order initially limited discovery of the *rehabilitator* or its consultants with respect to its plan. However, this order was entered months prior to a petition for liquidation and was within the trial court's authority. It should be highlighted that time is extremely important as to insolvency matters and we determine that the legislature has expressly granted the trial court power to issue such orders as the court deems appropriate and necessary. *Milner, supra,* (a bank closing and reorganization case) relates to a similar contention that the Rules of Civil Procedure should apply in spite of the statute. It was held that a simple, *expeditious* procedure is contemplated for the benefit and protection of the depositors. *Volvo Car Corp. v. Hopkins,* Ky., 860 S.W.2d 777 (1993), does not support KCL's argument as that case was not a special statutory proceeding case. We find no actions undertaken by the trial court denied KCL an opportunity to formulate its defense during liquidation.

KCL repeats the argument that the trial court erroneously relieved the Commissioner of any burden of proving grounds for liquidation. We have addressed the argument as to burden of proof and find this portion to be reargument. CR 43.01 is not applicable to KCL's argument. Additionally, we answer this argument by reference to the trial court's finding that the company was insolvent no later than February 12, 1993, under statutory accounting principles as provided in KRS 304.33–030(18) and continued to be insolvent as of August 18, 1994. KCL's assets,

despite the best efforts by the Commissioner, were still less than its liabilities by at least $141 million on a statutory accounting basis. Substantive evidence supports the finding.

We now consider KCL's statement that the trial court approved an arbitrary taking of its property without permitting KCL meaningful opportunity to defend itself and without permitting just compensation as is constitutionally mandated. KCL cites *International Shoe Co. v. Washington,* 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945); *Boddie v. Connecticut,* 401 U.S. 371, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971); *Webster County v. Vaughan,* 234 Ky. 618, 28 S.W.2d 966 (1930); and *Carrithers v. City of Shelbyville,* 126 Ky. 769, 104 S.W. 744 (1907), as a prohibition to the deprivation of property without due process. These cases do indeed set forth these principles of constitutional law, but they are accompanied by no meritorious recitation of factors applying to this case. Indeed, when applying the constitutional principles argued to the exacting facts of this litigation, it becomes evident that no violation of the board's or shareholder's substantive or procedural due process rights occurred. The Fifth Amendment guarantees due process only to those deprived of rights, liberty, or property.

Precise definition of any property at stake is crucial to determining whether the government has deprived the owner. Property rights " 'are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits.' " *Parratt v. Taylor,* 451 U.S. 527, 529 n. 1, 101 S.Ct. 1908, 1910 n. 1, 68 L.Ed.2d 420, 425 n. 1 (1981) (quoting *Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548, 561 (1972)).

*Federal Deposit Ins. Corp. v. Morrison,* 747 F.2d 610 (11th Cir.1984).

The Insurance Code, KRS 304.33–430, prioritizes the order of distribution of claims from an insurer's estate in order of classification: administration costs; wages; loss and

**590**

unearned premium claims; residual classification; claims based solely on judgments; interest on claims already paid; and miscellaneous subordinated claims. Appearing next to last in order are preferred ownership claims and at the bottom of the list are the proprietary claims, which include claims of shareholders or other owners.

Reference by KCL to de facto liquidation prior to securing a liquidation order continues to lack merit. Bid solicitations emphasized that first priority would be given to a plan for infusion of capital. Also, there was no disallowal of discovery after liquidation was approved. In fact, the trial court afforded discovery avenues while rehabilitation was underway. The universal rule of stockholder liability is simply a function of the basic concept that stockholders are remaindermen and that their only interest is in the equity, only what is left over after all corporate obligations have been paid. *Central States, Southeast and Southwest Areas Pension Fund v. Minneapolis Van & Warehouse Co.,* 764 F.Supp. 1289 (N.D.Ill.1991). The business of insurance is affected with the public interest and Kentucky has an important and vital interest in the liquidation or reorganization of a troubled insurance business. *Carpenter v. Pacific Mutual Life Ins. Co. of California,* 10 Cal.2d 307, 74 P.2d 761 (1937); *see also, Kenton & Campbell Benevolent Burial Ass'n v. Goodpaster,* 304 Ky. 233, 200 S.W.2d 120 (1946).

Additionally, KCL has skirted the statutes which specifically recognize that the Commissioner may accomplish his task by reinsuring the business of the company with another company. KRS 304.33–160(5). This is not, as alleged, a pure liquidation measure.

■ Not always does due process require a trial or the strict application of evidentiary rules and/or unlimited discovery. The court may construct, especially under special statutory proceedings, a more flexible procedure to account for the affected interest or potential deprivation. Procedural due process is not a static concept, but calls for such procedural protections as the particular situation may demand. *Morrissey v. Brewer,* 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972). It bears repeating that in light of the entire

record, the board/shareholders have been granted extensive access to information. They hired experts and fully participated at hearings, with counsel, by subpoenaing and cross-examining witnesses.

■ The due process clause does not restrict the state's reasonable exercise of its police power in furtherance of the public interest, even though such laws may interfere with contractual relations and commercial freedoms of private parties. *Warschauer Sick Support Society v. State of N.Y.,* 754 F.Supp. 305 (E.D.N.Y.1991). It is not enough that the Commissioner's plan affects shareholders' property rights. Instead, the shareholders/board must demonstrate that it does so arbitrarily. *Golden Pacific Bancorp v. U.S.,* 15 F.3d 1066 (Fed.Cir., 1994). There appears to be no violation of the shareholders' procedural due process rights. The shareholders' property interests are defined by state law. While determining whether the process afforded is adequate, the court should consider the private interests affected, the governmental interests affected, and the fairness and reliability of the existing procedures and the probable value, if any, of additional procedural safeguards. *Palmer by Palmer v. Merluzzi,* 868 F.2d 90 (3d Cir.1989). A case by case basis may more accurately determine the adequacy of procedure for due process purposes.

■ KCL maintains that the Jefferson Pilot plan would result in an unconstitutional taking of its property without just compensation. While the state has the power to regulate the insurance business, its power to regulate cannot be permitted to obscure the Bill of Rights. *See Kenton & Campbell Benevolent Burial Ass'n, supra.* The legislative authority may not, under the guise of promoting public interest, arbitrarily interfere, and police power is not without limitations. Keynoting this reference is the phrase *arbitrary interference. Illinois Cent. R. Co. v. Commonwealth,* 305 Ky. 632, 204 S.W.2d 973 (1947). Certainly, extraordinary power is not without limitation, but in this case it has not been established by KCL that the Commissioner has operated unreasonably or arbi-

trarily beyond the occasion and necessity of the situation.

■ In conjunction with KCL's objection to the JP plan, it is maintained that the trial court erred by approving the Commissioner's actions and recommendations. KCL's primary thrust faults the process by which the Commissioner's plan was promulgated and approved. Otherwise, direct criticism of the plan wanes. The evidence is replete with the fact that KCL is irretrievably insolvent and that a fair and equitable plan for the reorganization and reinsurance of KCL's business was negotiated. An insolvent insurer has the burden of showing rehabilitation is feasible. *Shepherd v. Old Heritage Mutual Ins. Co.,* 492 Pa. 581, 425 A.2d 304 (1980). At no step during this litigation has it been made evident that either creditors or policyholders have sought to displace or replace the plan. The plan beneficially provides for the policyholders as follows:

Preservation of full pre-rehabilitation life insurance protection regardless of current health or insurability.

Fully or partially covered policyholders will have 100 percent of their policy values protected at Closing by virtue of JP Life's enhancement and NOLHGA's additional financial support.

Policy values of non-covered policyholders will be restructured to reflect the value of assets transferred at Closing *and* JP Life's enhancement.

JP Life will credit a competitive interest rate to policyholder account values. The actual rate is tied to the yield on five-year Treasury obligations at Closing.

JP Life will credit a competitive interest rate on new life insurance premiums paid after Closing—one percent above the yield on five-year Treasury obligations on January 1st of each year, not to exceed the yield on five-year Treasury obligations at Closing, plus one percent.

Substantially all surrender, withdrawal, and policy loan rights will be restored for covered policyholders. Covered policyholders who surrender their contracts will receive the greater of the surrender benefits provided by the Life and Health

Agreement or by the Participating Guaranty Associations.

Covered KCL policyholders, whose policies remain in force during the five year plan, will receive a five percent persistency bonus if it would improve the benefit otherwise provided under the Plan.

■ Section 2 of the Kentucky Constitution provides that absolute and arbitrary power over the property of free men exists nowhere and it envisions that the state, in the exercise of its police power, may not unreasonably invade and violate private rights guaranteed under the federal or state constitutions. *Illinois Cent. R. Co., supra.* In this case, we determine that the state was justified in interposing its authority on behalf of the public. The interest of the public required the interference of rehabilitation/liquidation and the means were reasonably necessary for accomplishing the purpose, and not unduly oppressive upon individuals. *Goldblatt v. Town of Hempstead, N.Y.,* 369 U.S. 590, 82 S.Ct. 987, 8 L.Ed.2d 130 (1962).

KCL's argument is not persuasive when it states that the trial court erred by approving the Commissioner's arbitrary actions and recommendations. As stated in the Findings of Fact and Conclusions of Law, the Commissioner, acting on advice from his experts (accounting, actuarial, legal), instituted and began a two-phase bidding process, later to develop into the JP plan. Initially the Commissioner solicited bids for KCL's business and provided for two alternative forms of bids. The first bid was for an infusion of capital into KCL as part of rehabilitation. The second bid was for the purchase, through assumption reinsurance, of all or substantially all of KCL's life insurance business.

Subsequently eight entities submitted bids over the first phase. Preference was given to infusion of capital, but no investor submitted such bid. As a result of the bidding JP was selected as the lead bidder based upon its bid, strength and ability to stand behind KCL's obligation to policyholders. As paramount bidder JP negotiated a "definitive" life and health agreement in conjunction with the rehabilitation of KCL. The bid process, sec-

ond phase, began after the JP definitive agreement had been finalized and all first round bidders received the agreement as a basis for bidding and were encouraged to increase their offers. Upon the second phase of the bid process JP made the highest bid in the amount of $341 million, which was subsequently readjusted. The trial court found the bidding process fair, open and designed to attract the highest possible values for KCL. The Commissioner, JP, and the National Organization of Life and Health Guaranty Associations (NOLHGA) entered into an agreement (amounting to a safety net for the protection of policyholders) which was given the trial court's approval.

No party, following the entry of the final order, sought, by written request, to make additional findings or to amend the judgment (final order). *Cherry v. Cherry*, Ky., 634 S.W.2d 423 (1982); *Crain v. Dean*, Ky., 741 S.W.2d 655 (1987).

The findings of fact and order of Franklin Circuit Court are affirmed.

All concur.

Special Justice THOMAS P. LEWIS sitting for Chief Justice STEPHENS.